■ In the Matter of RICHARD SS., a Child Alleged to be Abused and Neglected. SCHENECTADY COUNTY DEPARTMENT OF SOCIAL SERVICES, Appellant; TAMMY TT., Respondent. (Proceeding No. 1.) In the Matter of RICHARD SS., a Child Alleged to be Abused and Neglected. SCHENECTADY COUNTY DEPARTMENT OF SOCIAL SERVICES, Appellant; CHARLES TT., Respondent. (Proceeding No. 2.) [815 NYS2d 282]—

Spain, J. Appeals from two orders of the Family Court of Schenectady County (Powers, J.), entered May 6, 2005, which dismissed petitioners' applications, in two proceedings pursuant to Family Ct Act article 10, to adjudicate the subject child to be abused and/or neglected by respondents.

Petitioner commenced these Family Ct Act article 10 proceedings in July 2004 by separate petitions against respondent Tammy TT. and her husband, respondent Charles TT.; respondents were the former foster parents of the subject child (born in 1987). The petition against Tammy alleged that she had engaged in sexual acts on an ongoing basis with the child, who had been placed in respondents' home as a foster child; he was 16 years of age during the period in which the sexual activity occurred. The petition against Charles alleged that he was aware of his wife's behavior and knowingly allowed it to continue. Following petitioner's presentation of proof at a hearing in which the child did not testify, Family Court granted respondents' motion—without seeking a position from the child's Law Guardian—to dismiss both petitions, finding that the child's out of court statements had not been sufficiently corroborated. Petitioner appeals.

At the fact-finding hearing, the following witnesses testified: a Child Protective Services (hereinafter CPS) caseworker from Saratoga County who interviewed the child as part of her hotline investigation; the foster mother in whose home—in the Town of Waterford, Saratoga County—the child resided from early March 2004 until late June 2004; the Waterford foster mother's adult daughter who made the hotline report after the child disclosed to her his sexual activities with Tammy; a Schenectady County CPS caseworker who interviewed the child with the City of Schenectady police on July 2, 2004; and Angela Baris, a validation expert employed by Northeast Parent and Child Society (hereinafter Northeast), who also interviewed the child on July 2, 2004. Two written statements signed by the child and two reports based on interviews with the child were received in evidence.

On respondents' motion to dismiss at the close of petitioner's

case, evidence presented "must be viewed in the light most favorable to the petitioner" (*Matter of Evelyn X.*, 290 AD2d 817, 819 [2002], *lv dismissed* 98 NY2d 666 [2002]). Here, the proof establishes that, in early September 2003, the child was placed in respondents' home. In February 2004, because of "behavioral problems," the child was moved out of respondents' home into a group home in Schenectady County run by Northeast. The following month, the child was moved out of the group home but was not returned to respondents. Instead, he was placed in the home of the Waterford foster mother and her husband. Three months later, the adult daughter of the Waterford foster mother—who was temporarily living in her parents' home with her husband and baby—made a report to the Statewide Central Register of Child Abuse and Maltreatment that the child had revealed to her that he and Tammy had engaged in sexual activities on an ongoing basis from shortly after he was placed in her home in September 2003 to June 2004. The Saratoga County CPS commenced an investigation on June 14, 2004. On June 24, 2004, after Tammy had made phone contact with the child, temporary orders of protection were issued ex parte in Family Court, Schenectady County, directing—in separate orders—that respondents refrain from any contact with the child.

The record contains a typed statement given by the child to a New York State police investigator and signed by the child under penalty of perjury on June 15, 2004, in which he describes an incident in September 2003—when he was living with respondents—where, while at the movies, Tammy rubbed his leg and penis; afterward, they went back to the house where, after the other children went to bed, he and Tammy watched a movie in her bedroom and engaged in sexual intercourse and oral sex. He states that they engaged in intercourse "a couple times a week" until he moved out in early February 2004 and that their sexual relationship continued while he was at the group home. Following his move to the Waterford foster home, he and Tammy communicated secretly after Tammy told him that she was told not to contact him. He states that he used pay phones and sent messages to her through his sister and that Tammy continued to call him at his Waterford foster home. Most of the time she would pick him up at the group home or at school, go to a secluded location and have sex with him in her tinted-windowed vehicle. According to the child, the last time he saw Tammy was in early June 2004, when she picked him up at school and took him to a parking garage where they had intercourse in her vehicle. Further, he states that she told him that she had a "tubular pregnancy" and said that it was probably his child.

The record also contains a five-page sworn affidavit given by

the child to a Schenectady police detective on July 2, 2004, wherein he describes Tammy's pursuit of him and sexual encounters in detail, stating that, when he lived with respondents, he and Tammy would frequently have intercourse throughout the house—usually when Charles was not home— and in her vehicle. He also states that this sexual activity continued after he was placed in the group home in early February 2004, that Tammy often phoned him twice a day and would make excuses to remove him from the group home or picked him up at school so they could have sex, and that they had engaged in oral sex while they were alone in the group home's family room. He further states that on what he believes was February 18, 2004, she took him from the group home to bring him to a scheduled dental appointment—which she then cancelled by phone—and, instead, took him to a mall where they watched a movie, had dinner and then engaged in sex in her vehicle before she returned him to the group home. He states that they engaged in sex 8 or 10 times during the period that he was at the group home. He observed that Tammy had a tattoo on her spine which was "diamond shape[d] with lines," and that she shaved her pubic area.

In these Family Ct Act article 10 proceedings, petitioner bore the burden of proving by a preponderance of the evidence that respondents abused or neglected the child (*see* Family Ct Act § 1046 [b] [i]). "Although a child's uncorroborated statement is insufficient [by itself] to support a factual finding of abuse or neglect, such a statement may be corroborated by any evidence tending to support its reliability, and a relatively low degree of corroborative evidence is sufficient in abuse proceedings" (*Matter of Joshua QQ.*, 290 AD2d 842, 843 [2002] [citations omitted]). Upon our review of the record before us in the light most favorable to petitioner and exercising our own factual review power (*see Matter of Anita U.*, 185 AD2d 378, 379 [1992]), we find that sufficient evidence was adduced on the record to meet the minimal level of corroboration necessary to support a factual finding of abuse and neglect as to Tammy and, thus, Family Court improperly dismissed that petition. However, we agree with the court that there is insufficient evidence in the record to support the petition against Charles.

While mere repetition of the accusations is insufficient (*see Matter of Nicole V.*, 71 NY2d 112, 123 [1987]; *Matter of Sasha R.*, 24 AD3d 902, 903 [2005]), some corroboration can be provided through the consistency of a child's statements (*see Matter of Joshua QQ., supra* at 843; *Matter of Brandon UU.*, 193 AD2d 835, 837 [1993]). Here, the 16-year-old child gave—

with few exceptions—consistent, lengthy and detailed accounts of various instances of clandestine sexual activity to several individuals, to the State Police and in his sworn affidavit to the Schenectady police (*see* Penal Law art 210).

Furthermore, the child's reports that after he left her home Tammy continued to pursue him through phone contact and by picking him up at school and at the group home are supported by the Waterford foster parents' phone records and school attendance records. The Waterford foster mother testified that she was a party to a safety plan aimed at preventing Tammy and the child from communicating. Her phone records and her testimony confirm that—unknown to the Waterford foster parents—calls were coming to their home phone from Tammy's home phone on a regular basis subsequent to the restriction on her communication with the child.[1] She also testified that she personally dropped off the child at school every day at about 7:30 A.M. and picked him up at the end of the day. The child's statement that Tammy would pick him up at school after he was dropped off by the Waterford foster mother, but before he was supposed to get on a bus that would bring him to his VoTech program, is corroborated by school records which verify that, despite being dropped off at school on time every day, he had many unexcused absences during that period. There is also corroborative record evidence that Tammy agreed with the staff at the group home to take the child to a February 18, 2004 dentist appointment, the same date he reported that she cancelled the appointment, took him to a movie and dinner, and then had sex with him. In our view, the foregoing evidence, if credited, provides proof demonstrating Tammy's persistent and obsessive pursuit of the child by her secret communication with him even while they were under scrutiny.

Additionally, at the fact-finding hearing, Erin Hughes—the CPS caseworker with the Saratoga County Department of Social Services—testified that she was assigned to investigate the hotline report and that she interviewed many witnesses, including the child. Her "indicated" investigation report—completed on August 25, 2004—concludes, among other things, that there is some credible evidence to support the allegations of sexual abuse and maltreatment against Tammy, providing some additional corroborative evidence as an agency report "suggesting the [foster] parent committed the act[s] or omission[s]" alleged (*Matter of Nicole V., supra* at 118; *see* Family Ct Act § 1046 [a]

---

1. Her adult daughter testified that a woman who identified herself as "Tammy" called the Waterford foster home and asked for the child after the safety plan had been put in place.

[iv], [v]; *Matter of Evelyn X.*, 290 AD2d 817, 820 [2002], *supra*; *Matter of Melissa I.*, 256 AD2d 671, 673 [1998]).

Finally, Baris's testimony and report reflect that she followed the Yuille protocol and that she never wavered in her testimony as a validation expert that the child's statements satisfied most of the Yuille reliability criteria. Significantly, the child's report to her was consistent with other reports he had made (*see Matter of Nicole V.*, 71 NY2d 112, 121-122 [1987], *supra*) and, as Baris opined, his statements included extreme and unusual detail, including that Tammy informed him of her tubular pregnancy and his observation of her pubic area and her tattoo, both of which would only be visible if she were unclothed.[2] Although there are suggestions in the record that the child may have recanted his statements against Tammy prior to meeting with Baris, he did not recant in Baris's presence. Moreover, even direct evidence of a change of position by the child would not totally undermine the corroborative evidence in this record as "a child's recantation of allegations of abuse does not necessarily render [the] statements incredible, but rather is recognized as 'a "common reaction among abused children" ' " (*Matter of Martha Z.*, 288 AD2d 706, 707 [2001] [citations omitted]; *see* Besharov, Practice Commentaries, McKinney's Cons Laws of NY, Book 29A, Family Ct Act § 1046, at 138). We conclude that, despite her concessions regarding the child's credibility on cross-examination, Baris's testimony, if credited, provides further corroborative support for the child's out-of-court statements; and, even discounting Baris's testimony, there is—overall—sufficient corroboration. Accordingly, the petition against Tammy should be reinstated and the proceedings remitted to Family Court for the continuation of the fact-finding hearing, including an opportunity for the Law Guardian to be heard and to present proof.

We also note that Family Court improperly issued a subpoena directing petitioner to provide respondents with all of the child's mental health records. Pursuant to Mental Hygiene Law § 33.13 (c), clinical records may be released only under certain circumstances. As relevant here, the statute provides that they may be released "pursuant to an order of a court of record requiring disclosure upon a finding by the court that the interests of justice significantly outweigh the need for confidentiality"

---

2. On cross-examination of Baris, using a photograph apparently of Tammy's exposed back (the photograph is not part of the record) and an offer of proof, respondents' attorney conceded that Tammy did indeed have a tattoo on her back, although it was unclear if she had other tattoos on less visible parts of her body.

(Mental Hygiene Law § 33.13 [c] [1]; *see Matter of Michelle HH.,* 18 AD3d 1075, 1077-1078 [2005]; *see also Cynthia B. v New Rochelle Hosp. Med. Ctr.,* 60 NY2d 452, 461 [1983]; *Matter of Irwin v Neyland,* 213 AD2d 773, 774 [1995]). Further, a party's mental health records are subject to discovery where that party has placed his or her mental health at issue (*see Matter of Frierson v Goldston,* 9 AD3d 612, 614 [2004]; *Ace v State of New York,* 207 AD2d 813, 814 [1994], *affd* 87 NY2d 993 [1996]; *Zimmer v Cathedral School of St. Mary & St. Paul,* 204 AD2d 538, 539 [1994]). Absent such a finding, this Court has held that it is error to grant access to a child's mental health records (*see Matter of Michelle HH., supra* at 1077-1078). Moreover, if access is granted, "the parameters of said access must be meticulously defined . . . to maintain confidentiality" (*id.* at 1078).

Here, petitioner denied respondents' requests for the disclosure of the child's mental health records and related information on the ground that such information was confidential and could not be disclosed without a court order. On December 2, 2004, Family Court issued a subpoena directing petitioner to provide respondents with "[a]ny and all records and/or documentation relating to health care services relating to a mental and/or emotional condition of [the child]," and petitioner complied. On the record before us, the court made no findings with regard to whether the interests of justice outweighed the need for confidentiality, nor did it "meticulously define[]" the "parameters of said access" (*id.* at 1077-1078). Further, while the child's mental health status may be relevant to assess whether the abuse occurred, neither petitioner, the Law Guardian nor the child waived the right to prevent access to his records by placing his mental health at issue (*compare Matter of Frierson v Goldston, supra* at 614-615; *Ace v State of New York, supra* at 814). As the Law Guardian argues on appeal, petitioner alleged that Tammy abused the child and did not allege any injury to the child's mental health (*compare Syron v Paolelli,* 238 AD2d 710, 710-711 [1997]).

Based on the foregoing, Family Court erroneously allowed respondents to have access to "any and all" of the child's mental health records without making the requisite inquiry. Permitting such carte blanche access to these sensitive and confidential records was clearly error.

Cardona, P.J., Carpinello, Rose and Kane, JJ., concur. Ordered that the order dismissing the petition against respondent Tammy TT. is reversed, on the law, without costs, and matter remitted to the Family Court of Schenectady County for further proceedings not inconsistent with this Court's decision. Ordered

that the order dismissing the petition against respondent Charles TT. is affirmed, without costs.